UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA      .    Criminal No. 1:18mj196
                              .
     vs.                      .    Alexandria, Virginia
                              .    June 7, 2019
GEORGE AREF NADER,            .    2:12 p.m.
                              .
            Defendant.        .
                              .
. . . . . . . . . . .
```

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE IVAN D. DAVIS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE GOVERNMENT:          JAY V. PRABHU, AUSA
                             LAURA FONG, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314


FOR THE DEFENDANT:           CHRISTOPHER J. CLARK, ESQ.
                             Latham & Watkins LLP
                             885 Third Avenue
                             New York, NY 10022
                               and
                             TIMOTHY H. McCARTEN, ESQ.
                             Latham & Watkins LLP
                             555 11th Street, N.W., Suite 1000
                             Washington, D.C. 20004-1304


TRANSCRIBER:                 ANNELIESE J. THOMSON, RDR, CRR
                             U.S. District Court, Third Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595


(Pages 1 - 44)


(Proceedings recorded by electronic sound recording, transcript
 produced by computerized transcription.)

2

1                    P R O C E E D I N G S

2                   (Defendant present.)

3           THE CLERK:  United States v. George Nader, Case

4    No. 18mj196.

5           MR. PRABHU:  Good afternoon, Your Honor.  Jay Prabhu

6    and Laura Fong for the United States.

7           THE COURT:  Good afternoon.

8           MR. CLARK:  Good afternoon, Your Honor.  Chris Clark

9    from Latham & Watkins.  With me is my colleague, Tim McCarten.

10   We appreciate you accommodating us today.

11          THE COURT:  Good afternoon.

12          This matter is before the Court for a detention

13   hearing.  Are the parties ready to proceed?

14          MR. CLARK:  The defendant is ready, Your Honor.

15          MR. PRABHU:  Yes, Your Honor.

16          THE COURT:  All right, just to ensure that the Court

17   received a courtesy copy of a supplemental memorandum in

18   support of the original emergency motion to release Mr. Nader

19   conditionally.  Did the government receive a copy of that as

20   well?

21          MR. PRABHU:  We received one electronically, yes,

22   Your Honor.

23          THE COURT:  And you've had an opportunity to review

24   that?

25          MR. PRABHU:  Yes, Your Honor.

3

1        THE COURT:  All right.

2        MR. PRABHU:  May I proceed?

3        THE COURT:  You may.

4        MR. PRABHU:  Your Honor, this is a presumption case,

5   as the Court recognized yesterday, but the facts and

6   circumstances associated with this particular defendant

7   actually go way beyond the situations that this Court typically

8   observes.  The defendant is an extreme danger to the community

9   and risk of flight.

10        If the government may proffer for the Court?

11        THE COURT:  Counsel.

12        MR. CLARK:  I'd agree to a proffer within the

13   confines of the complaint and the defendant's criminal history

14   report, but if there's anything beyond that, it hasn't been

15   raised with me by counsel.  I asked him whether he was going to

16   have a witness, and he said yes yesterday and no today.

17        So I'm happy to talk to him about the extent of what

18   the proffer is going to be.  I certainly have no objection to

19   what's in the papers, Your Honor.

20        THE COURT:  We knew we were here for a detention

21   hearing today.  Did we not feel it necessary to discuss the

22   probability that both parties may be offering information by

23   proffer and whether or not that was acceptable to the other

24   party so we wouldn't have to deal with this issue in court?

25        MR. CLARK:  No one raised it with me, Your Honor.

4

1          MR. PRABHU:  Your Honor, yesterday I said we were

2     preparing to proceed by proffer but it would be up to the

3     Court, and today, as they asked to bring a witness, I said

4     proffers would be acceptable.

5          THE COURT:  All right.  Well, you've heard the

6     parameters of what he believes is an acceptable proffer.  Does

7     the information you wish to proffer to the Court go beyond

8     those parameters?

9          MR. PRABHU:  There are some items, yes.  With

10     specific respect, Probation in their report indicates a

11     dismissed charge.  That is one of the things that I was going

12     to address.

13          MR. CLARK:  No objection.

14          THE COURT:  Not his criminal history.

15          MR. CLARK:  No objection, Your Honor.

16          MR. PRABHU:  Yes.  So criminal history both overseas

17     and in the United States is what the proffer would be.

18          MR. CLARK:  Your Honor, I strenuously object to the

19     offer of information of any alleged criminal history of the

20     defendant overseas.  The government has completely wrong

21     information about that.  I raised that to them yesterday.  I

22     said I was going to cross a witness on it, and I asked them for

23     any discovery they had with regard to that yesterday.

24          They told me they didn't have it, and if they want to

25     raise this issue by which they're wrong by proffer, it's highly

5

1   improper.  If they've got any piece of evidence, I would like

2   to look at it right now, and I'll be happy to tell the Court

3   whether I'll accept it, but I have a feeling I know what this

4   is, and it's false.

5          That's my -- that's my concern, Your Honor.

6          THE COURT:  Well, that's your belief.

7          MR. CLARK:  I have the documents, Your Honor.

8          THE COURT:  No one knows the truth, the validity or

9   the invalidity of the information except the individuals

10  involved, which would be neither one of these counsel.

11         MR. CLARK:  That's correct, Your Honor, but I have

12  the court documents.

13         THE COURT:  Well, then if you have court documents

14  that would suggest that the information that's being proffered

15  is not true, then offer them at the appropriate time.  Why do

16  we need a witness?

17         MR. CLARK:  I don't think the, the government should

18  be proffering information that's incorrect, but, Your Honor --

19         THE COURT:  Well, this is a detention hearing.

20  Hearsay is acceptable.  The rules of evidence don't apply.

21         MR. CLARK:  I understand that, Your Honor.

22         THE COURT:  You may be seated.

23         You may continue.

24         MR. PRABHU:  Thank you, Your Honor.  George Nader is

25  a dual citizen of the United States and Lebanon.  He has an

6

1    extensive history of travel overseas, has resided overseas for

2    extended periods of time and deep and numerous connections to

3    overseas entities, but let me first address his criminal

4    history.

5          The incident charged against him is that he traveled

6    from overseas on January 2018.  He brought a cellular telephone

7    into Washington Dulles International Airport, which is in the

8    Eastern District of Virginia, and that phone was found to

9    contain alleged images of child pornography.

10         I'm sure the Court has read the complaint in the case

11   which describes in general terms the illicit nature of the

12   materials involved and the seriousness of the charge.  Two

13   points the government would make about the videos that are

14   charged in the complaint:  Some of the videos alleged in the

15   complaint were actually sent by Mr. Nader to another party, and

16   the alleged child pornography videos that he received were sent

17   from more than one other individual.  So it wasn't just him and

18   one person.  It was him and multiple people sharing these

19   videos back and forth that were found on his phone.

20         The current charge is exacerbated by the fact that

21   this is not the first time Mr. Nader has been accused of

22   bringing child pornography into the United States.  In July

23   1990, the defendant arrived at Dulles with two reels of film

24   containing child pornography concealed in candy tins.  He was

25   indicted in the Eastern District of Virginia and pled guilty to

1    knowing transportation of child pornography in 1991.  That is

2    the same charge that he was arrested for on Monday of this

3    week.

4            As the Court is well aware, a second offense of

5    violating 18 U.S.C. 2251(a) is now punishable by a mandatory 15

6    years in prison, and this is a clear reason for a 60-year-old

7    man to flee the jurisdiction, if not the country, but these are

8    not Mr. Nader's only interactions with law enforcement about

9    sexually explicit material involving minors.  In fact, the

10   first occurred in 1984, 35 years ago.

11           Early in 1984, U.S. Customs intercepted an envelope

12   address to J. Nader in Washington, D.C., mailed from Amsterdam.

13   That envelope contained a spool of 8 millimeter film and four

14   magazines which included images of minor boys engaged in sex

15   acts.  There were also two magazines in the envelope where

16   minor boys were nude.

17           George Nader was charged with importing obscene

18   material at the time.  The search warrants used to review the

19   materials were challenged in D.C. District Court.  The court

20   found that the warrants were general warrants and threw the

21   evidence of Mr. Nader receiving the sexually explicit material

22   involving minors out, and the charges were dropped.  If the

23   Court wishes to review the D.C. District Court's opinion, it is

24   621 F. Supp. 1076.

25           This is relevant again because it shows the 35-year

8

1    history of George Nader's interest in child pornography, and

2    this interest continued at least until early 2018, when he left

3    the United States.

4          But again, that's not the end of the story.  The

5    government has received documents from the Czech Republic.

6    Mr. Nader was indicted by Czech authorities with commercial sex

7    with at least ten minor boys between 1999 and 2002.  He was

8    arrested by Czech authorities in 2002.

9          According to the documents provided to the U.S.

10   government, Mr. Nader's indictment indicated that he offered

11   food or small or bigger gifts, usually clothes, mobile phones,

12   and even jewels, to the minor boys.  For each meeting in which

13   sexual activity took place, the indictment claims Mr. Nader

14   gave victims 2,000 Czech crowns, which we understand is worth

15   about 50 to 60 dollars.

16         George Nader was also accused of paying money to men

17   who provided the boys, and according to the documents we

18   received, the defendant was convicted and was given a year in

19   prison.

20         But again, the story doesn't stop there.  One of the

21   Czech child prostitutes that claimed he had sex with George

22   Nader gave a statement to the Czech authorities at that time

23   which has also been provided to the United States.  The witness

24   stated that George Nader transported him, a 14-year-old boy, to

25   the United States in 2000, and he used the boy in sexually

1    explicit conduct.

2            The boy confirmed this statement to the Federal

3    Bureau of Investigation in 2018, after Mr. Nader was charged in

4    this court.  The government has been able to corroborate the

5    travel plans of the 14-year-old boy, the fact that this child

6    prostitute's visa was arranged by Mr. Nader, and notably, the

7    boy testified that George Nader told him not to tell anyone

8    about what happened and threatened him and his mother in the

9    Czech Republic if he did.

10           This is consistent with the story of another child

11   that interacted with Mr. Nader that was interviewed by law

12   enforcement in 2002.  This boy stated that in 1997, when he was

13   14, George Nader transported him to the United States, and he

14   stayed at Mr. Nader's residence.  In 2002, the young man told

15   the FBI that he had watched at least one child pornography

16   video with George Nader at his residence in Washington, D.C.

17           As a result of that investigation, the FBI obtained a

18   search warrant at that time for George Nader's storage unit in

19   Washington, D.C.  In that storage unit in 2002, the FBI located

20   numerous copies of alleged child pornography in Mr. Nader's

21   storage unit.  Because Mr. Nader was not in the country at the

22   time and apparently remained overseas for an extended period,

23   no charges were filed, and eventually the alleged child

24   pornography was destroyed.

25           So that's the criminal context, Your Honor.  I think

1    given the history as both someone interested in child

2    pornography and having hands-on contact with more than a dozen

3    minor boys over 35 years, Mr. Nader is an extreme risk to the

4    community and has every incentive to flee.

5           The government has obtained evidence that Mr. Nader

6    has travel and/or identity documents for more than one country.

7    As I said, he's a citizen of Lebanon and the United States.  He

8    has a villa in the United Arab Emirates and identity documents

9    associated with that country.  He has a chalet in Lebanon,

10   which one of the minor boys testified -- who was interviewed

11   said he was brought to.

12          With respect to Mr. Nader's net worth, I believe,

13   though the government hasn't seen a transcript, Mr. Clark

14   conceded that he has a net worth of at least $3 million in the

15   prior detention hearing.  For its part, the government has

16   obtained evidence that he had cyber currency worth at least

17   $1 million and other properties in the United States and

18   abroad.

19          Mr. Nader has extensive foreign contacts.  A phone

20   seized from his possession in January 2018 contained contacts

21   for His Royal Highness Mohammed bin Zayed, MBZ, the Crown

22   Prince of the UAE.  It had a contact for a representative of

23   Mohammed bin Salman, the Crown Prince of Saudi Arabia, numerous

24   members of the Saudi royal family; ambassadors to various

25   countries, including Russia, Qatar, and the UAE; and phone

1  numbers for private security firms.  The FBI has obtained

2  numerous media reports demonstrating extensive apparent

3  contacts between George Nader and foreign governments and

4  entities.

5          There's some matters we discussed at the bench

6  yesterday that can be addressed by the facilities at issue.

7  Nothing in the submissions of the defendant overcomes the

8  presumption of detention.

9          Thank you, Your Honor.

10          THE COURT:  Thank you.

11          MR. CLARK:  Your Honor, I'm going to renew my

12  objection to that proffer of triple hearsay, nameless

13  accusations, but let me go through the real facts of what the

14  government just tried to make sound as dramatic and damaging as

15  possible without regard to the true facts.

16          So 35 years ago, Mr. Nader was arrested and charged

17  with an offense.  As an initial matter, Mr. Nader was bailed.

18  Mr. Nader appeared at every proceeding.  Mr. Nader wasn't

19  accused of any violations pending that proceeding, and the case

20  was dismissed against Mr. Nader.

21          There's no probative value to that, but what it shows

22  is when accused of an offense, Mr. Nader doesn't flee.  There's

23  nothing different about Mr. Nader then than now with regard to

24  his nationality, citizenship, international travel,

25  international connections, assets, and residences.  He had all

1  of the factors the government has just said are exacerbating

2  factors with regard to his dual citizenship, his travel

3  documents, his residences, his assets, the people that he

4  knows.  All of that was true in 1984.  1984, Your Honor, 35

5  years ago.  Mr. Nader appeared, prevailed, and never violated

6  while he was pending a case.

7       That shows that he's not a flight risk.  That shows

8  that he's not a danger to the community.  But let's talk

9  further --

10      THE COURT:  Besides the difference that what is

11 different between then and 2019 is he's 60 years old, facing a

12 mandatory minimum of 15 years in federal prison.

13      MR. CLARK:  That is an issue, Your Honor, and that's

14 why we're going to address it with a different --

15      THE COURT:  As long as we recognize that.

16      MR. CLARK:  I'm sorry, Your Honor?

17      THE COURT:  As long as we recognize that.

18      MR. CLARK:  We do, Your Honor.  We do, and that's why

19 we have a far, far different bail package proposed here than

20 was imposed in 1984 or that, indeed, was imposed in the offense

21 that he did take responsibility for.

22      So it's a very important -- the government has, has

23 raised the issue of the 1990 case that happened in this

24 district, and it's important to recognize that it's the same

25 charge, and as Your Honor says, that's an exacerbating factor

1    for sentencing.

2         However, what's important to recognize is Mr. Nader

3    was bailed at that time, too, at first by Judge Bryan and then

4    by Judge Cacheris, who took over the case, and five different

5    times, his bail conditions were eased to allow him during the

6    pendency of that case, he was released immediately, but to

7    travel internationally first to Russia, then to Lebanon, and

8    then for there to be no international restrictions whatsoever.

9         And Mr. Nader, having traveled to Russia, which at

10   the time did not have an extradition treaty with the United

11   States, traveled to Lebanon, which the government here has said

12   is a place that he owns a residence, and we don't deny that.

13        At any one of those departures, he could have not

14   returned, Your Honor, facing the same charge, and he did every

15   time.  And the reason is because George Nader considers himself

16   a citizen of the United States.  He's always going to subject

17   himself to the United States justice system.  He's not going to

18   ever flee, and he's not going to violate while on release, and

19   his conduct has shown that time and time again.

20        Now, his conduct in this case is incredibly

21   important.  We gave you details of that in our submission, and

22   it's utterly ignored in what the government said, but it's

23   very, very important to understand Mr. Nader's conduct here.

24        Mr. Nader's phone was seized from him in January of

25   2018.  The government has submitted to you, as they must, that

14

1   Mr. Nader knew there was prohibited conduct on that phone.

2   They not only have submitted it in the complaint, but learned

3   counsel has explained why based on evidence that's nowhere in

4   the complaint, but that apparently he sent some texts or

5   whatnot, that he knew there was content on that phone.

6           So in January of 2018, he knows the FBI has his

7   phone, and according to the government, he knows there's

8   prohibited content on that phone, and for good or for bad,

9   Mr. Nader's been through this process before, and Mr. Nader,

10  whatever the government submits about, well, he knows people in

11  the Middle East and he's got a home in Lebanon and he's got a

12  home in Abu Dhabi, he comes back to the United States four

13  times.

14          The government admits they knew about the, the

15  information on the phones while he was coming back and forth

16  from the Middle East to the United States, but if Mr. Nader was

17  a flight risk, and Mr. Nader knew the government had his

18  phones, which is undeniable, and Mr. Nader knew there was

19  content on the phones, which we deny but they submit, how is he

20  a flight risk?

21          He's coming back to this jurisdiction time and again.

22  Either he's innocent because he had no idea there was something

23  on his phone, or he's coming back to the United States because

24  he always comes back to the United States.  That's what

25  happens.

1    There's -- actually every action both by Mr. Nader

2  and by the government in this case show he's not a flight risk,

3  because they didn't move for a year to apprehend him,

4  notwithstanding their knowledge that he came back and forth

5  into the United States to meet with the FBI.  Again, Your

6  Honor, if he was going to flee and he knew the FBI had his

7  phone and he knew, according to them, that this information was

8  on it, wouldn't he have fled?

9    No, he came back and met with the FBI four times, and

10  then he came back again.

11    And Your Honor, Your Honor showed a little bit of,

12  you know, there was a gesture --

13    THE COURT:  Counsel, I think a portion of this is why

14  you sought to put your supplemental memorandum under seal.

15    MR. CLARK:  You're right, Your Honor, and I think I

16  want to address that in a minute, but I'm trying to address

17  some of the government's arguments first.

18    And I think the final issue is this Czech thing,

19  which it is -- there was a lot of allegation and not much

20  specificity.  There were no names.  There were no -- there

21  apparently are documents.  Why weren't the documents proffered

22  to the Court?  Why can't we see the documents?  That was the

23  heart of my objection to begin with, Your Honor.  If they've

24  got proof, they should proffer proof.

25    They don't -- there's no burden on the Court to give

1  them documents.  We've certainly provided probably a fair

2  amount of documentation to this Court.  Why can't the

3  government proffer?

4          The reason is because the allegation the

5  government --

6          THE COURT:  If they provided the information, it

7  wouldn't be a proffer.

8          MR. CLARK:  That's fair, Your Honor, but there's a

9  reason they proffered it and didn't provide the information,

10 and that is because the individual that they just in open court

11 said besmirched Mr. Nader's name, the young man named (name

12 stricken per order of Court), didn't testify in the Czech

13 Republic.

14         MR. PRABHU:  Objection, Your Honor.  He's talking

15 about the victim.

16         THE COURT:  Sustained.  Counsel, I understand your

17 obligation to represent your client competently, zealously, and

18 to the best of your interests or the best of your ability in

19 his best interests.  There are rules --

20         MR. CLARK:  I apologize, Your Honor.

21         THE COURT:  -- by which these proceedings must go

22 forward.

23         Let's not forget them.

24         MR. CLARK:  I very much apologize, Your Honor.  The

25 difficulty here is --

1          THE COURT:  The name of the individual pronounced by

2    counsel will be stricken from any transcript of these

3    recordings.

4          MR. CLARK:  Thank you, Your Honor.  My apologies to

5    the Court.

6          There is specificity here.  There is a truth, and the

7    truth is that individual and that individual's mother did

8    provide evidence to the court in the Czech Republic, and

9    Mr. Nader was acquitted of the allegations that the government

10   has just proffered to the Court, and if they have the

11   documents, they knew that.

12         And, and I think it's prejudicial to my client, to

13   put it mildly, for them to proffer those facts and not

14   acknowledge the fact that the allegations were denied in open

15   court in the Czech Republic and rejected by the court.

16         THE COURT:  So we knew that before coming in here.

17         MR. CLARK:  Yes.

18         THE COURT:  Do you have the documents that say he was

19   acquitted?

20         MR. CLARK:  I do, Your Honor.

21         THE COURT:  Then what's the problem?

22         MR. CLARK:  The problem is that's why I asked the

23   government not to proffer the information that was incorrect.

24   We'll correct the record.

25         THE COURT:  So we didn't sit down before coming in

1  court, counsel, and say:  Okay, well, you want to proffer this.

2  Well, I don't believe your proffer will be accurate because I

3  have a document that says it's not.

4        And you handed that document to him, and he said:

5  Okay, you're right, so I won't say it.  Or he looked at the

6  document and says:  Okay, you're right, but I'm going to say it

7  anyway.

8        MR. CLARK:  I did ask him to talk about it, and he

9  declined to talk about it, and that's why I raised it to the

10  Court at the beginning of the proceeding, Your Honor.

11        THE COURT:  Then it serves no prejudice to your

12  client since you've now rebutted his proffer.

13        MR. CLARK:  Thank you, Your Honor.

14        So what we have here is a defendant who has been

15  twice accused in the United States of these offenses, once

16  prevailed, once took responsibility, and at every turn has

17  appeared in court, has never violated his bail conditions once,

18  has never attempted to flee, and has never committed an offense

19  while on release.  That's Mr. Nader's record as respects bail.

20        Now, Your Honor is correct there are, there are other

21  issues that we've raised here.  One thing that I want to

22  address from the outset is as we've laid out, Mr. Nader has a

23  very, very serious health condition.  There was discussion

24  yesterday about the idea that a doctor could see him at any

25  time in the facilities that he's held in.  We --

1          THE COURT:  I -- if that comment were made, I don't

2    recall it, but if it were made, I put nothing in it because the

3    United States Attorney's Office has no control over the

4    Alexandria Detention Center.

5          MR. CLARK:  That's fair, Your Honor, and I don't

6    fault them for it, but the reality is a doctor can't get in to

7    see Mr. Nader, and we tried, and I --

8          THE COURT:  When you prove to me that it's necessary,

9    you may have a better argument.

10         MR. CLARK:  Your Honor, we've submitted the affidavit

11   of Dr. Hulse --

12         THE COURT:  When you've proved to me it's necessary,

13   you may have a better argument.

14         MR. CLARK:  Okay, Your Honor.

15         THE COURT:  That would suggest that the Court is

16   telling you that what you've provided so far does not

17   accomplish that task.

18         MR. CLARK:  Thank you, Your Honor.

19         At a bare minimum, it was certainly a suggestion in

20   the papers that Mr. Nader needed to be seen by a doctor

21   promptly.  That was, in fact, the order of the court in

22   Brooklyn.  At the end of the proceeding, Judge Pollak said:  I

23   think we need to enter a bond that basically specifies that,

24   and obviously, this is without prejudice to him --

25         THE COURT:  And what steps have we taken since

1  yesterday to determine whether he could?  Because the

2  information you've provided in your supplemental memorandum

3  informed the Court of the fact that he could not be seen

4  yesterday because he wasn't cleared.  "Yesterday" and

5  "promptly" may be two different things.

6        I saw no information from medical professionals that

7  he said he needed to be seen yesterday.  What steps have we

8  taken in conversations with the Alexandria Detention Center to

9  see whether or not arrangements could be made for him to see

10 medical personnel after yesterday?

11       MR. CLARK:  We spoke to them -- we, we left messages

12 last night.  We spoke to them today.  We told them that we had

13 sent a doctor yesterday, that the doctor was turned away, could

14 the doctor see Mr. Nader today?  The answer was no, and we have

15 not been able to arrange a doctor for the weekend.

16       THE COURT:  Well, if asking a question doesn't get

17 you to what you want --

18       MR. CLARK:  I understand that, Your Honor.

19       THE COURT:  -- did you then follow it up with the

20 question of what do we need to do, what steps do we need to

21 take to give us a better chance of my client being seen by a

22 doctor?

23       MR. CLARK:  Understood, Your Honor.

24       THE COURT:  No, did you?

25       MR. CLARK:  Yes.  The nurses that we spoke to did not

1    have that information for us.

2              THE COURT:  And?

3              MR. CLARK:  And we'll get on the phone as soon as

4    we're out of the hearing again, Your Honor, to, to try to find

5    a way to get a doctor to Mr. Nader, but he had an urgent -- the

6    reason Mr. Nader flew here was for an appointment on Wednesday.

7              THE COURT:  Well, I'm going to ask you one simple

8    question:  What if Mr. Nader can't be seen at the Alexandria

9    Detention Center?  There are procedures by which he can be

10   transferred to a hospital to be seen.  What's the difference?

11             MR. CLARK:  We, we would very much --

12             THE COURT:  He doesn't have to be released under

13   those conditions.

14             MR. CLARK:  He doesn't, Your Honor; I agree.  So, I

15   mean, it -- as an initial matter, Your Honor, that would be our

16   application.  We would like Mr. Nader to be evaluated, and

17   we're willing -- and again --

18             THE COURT:  I don't think the government is objecting

19   to your client being evaluated if it's medically appropriate.

20             MR. PRABHU:  That's correct, Your Honor.

21             MR. CLARK:  Are they contesting that it is medically

22   appropriate, I guess, is the next question, Your Honor.

23             THE COURT:  That's not a decision they need to make.

24             MR. CLARK:  Okay.  So, Your Honor, the, the doctors

25   in Germany required that Mr. Nader be examined no later than

1    this week.  That's in the report.  Dr. Hulse said that that's

2    what needs to happen.

3         We had an appointment with Dr. Shimony on Wednesday.

4    That obviously for reasons that Your Honor is very familiar

5    with could not take place.  We then got an appointment, a

6    standing appointment with Dr. Hulse where he would make himself

7    available to evaluate Mr. Nader to see what the after-cardiac

8    care Mr. Nader requires is medically necessary, you know,

9    virtually at any time, but we haven't had anyone be able to

10   examine Mr. Nader to determine medical necessity, Your Honor.

11        Dr. Hulse had to give you his report based on our

12   information.  No one's been able to see him.

13        THE COURT:  Well, here's a question, because I found

14   it a little interesting when I looked at the declaration again

15   of Dr. Hulse that your client went through a procedure which

16   would seem to require follow-up and further evaluation by a

17   doctor or a specialist other than an anesthesiologist.

18        Dr. Hulse is an anesthesiologist.  How does an

19   anesthesiologist understand what follow-up is necessary for the

20   condition and/or procedures that your client underwent?

21        MR. CLARK:  It's, it's a fair question, Your Honor.

22   Dr. Hulse is the medical director of the Cardiac Aftercare

23   Center at the University of Virginia.  He is trained as an

24   anesthesiologist, but his specialty is assessing these

25   situations, and he's the medical director of that institute.

1          And so it's a fair question.  He is an

2   anesthesiologist, but this is what he does, and this is why we

3   wanted him to see Mr. Nader.

4          THE COURT:  And who else did he communicate with and

5   consult with in coming to that conclusion?  Because he

6   obviously thought it would be appropriate for him to consult

7   with others, even though that's his job to make the final

8   decision, to consult with those individuals who specialize in

9   the area of medicine upon which the client or the person he's

10  making the opinion has undergone --

11         MR. CLARK:  I think --

12         THE COURT:  -- since it's not his area of expertise.

13         MR. CLARK:  I think it very much is his area of

14  expertise, Your Honor.  He has done a fellowship at Johns

15  Hopkins University in cardio --

16         THE COURT:  This is a cardio issue.

17         MR. CLARK:  Yes.

18         THE COURT:  An anesthesiologist is not an expert in

19  cardio issues.

20         MR. CLARK:  Respectfully, Your Honor, again, he's

21  trained as an anesthesiologist, but he is the medical director

22  of the Cardiac Aftercare Center.

23         THE COURT:  So it is your representation to the Court

24  that he consulted with no one else.

25         MR. CLARK:  Your Honor, I believe that he used his

1    knowledge and experience in coming to his recommendation.  Our

2    application and desire would be to have that doctor or any

3    other suitably qualified cardiac aftercare doctor examine

4    Mr. Nader so all of us could figure out what needs to be done.

5              There, there is no dispute that he had open heart

6    surgery.

7              THE COURT:  We can move on from that.  No one

8    disputes the fact that your client may need follow-up

9    evaluation.

10             MR. CLARK:  Thank you, Your Honor.  We've --

11             THE COURT:  I don't think anyone contests the fact

12   that if you asked for it and it was capable of being provided,

13   then it would be.

14             MR. CLARK:  Well, that's the problem, is we've been

15   asking for it since Monday and it hasn't been provided,

16   respectfully.

17             THE COURT:  And you haven't given me any real

18   explanation on what steps were taken to acquire it except to

19   ask two nurses at the Alexandria Detention Center.

20             MR. CLARK:  Your Honor, that's --

21             THE COURT:  I didn't receive a motion for your client

22   to be transported to a hospital or to be transported to some

23   other cardio facility that could evaluate him, which would then

24   give the government an opportunity to provide its response to

25   said motion.

1          MR. CLARK:  Respectfully, Your Honor --

2          THE COURT:  Just for future reference --

3          MR. CLARK:  Fair enough.

4          THE COURT:  -- that's how things work in this Court

5   in the Eastern District of Virginia.

6          MR. CLARK:  Your Honor --

7          THE COURT:  We don't, we don't conduct business by

8   letter, telephone calls, conference calls.  Anything you want

9   from the Court, you file a motion.

10          MR. CLARK:  We have, Your Honor, and yesterday's

11  emergency motion for conditional release was an application

12  that Mr. Nader be released to the Inova Medical Center here in

13  Fairfax County so that he could be evaluated.  That was the --

14  that was the subject matter of our motion.

15          THE COURT:  Well, maybe you inartfully worded it.

16          MR. CLARK:  I apologize if we did, Your Honor.

17          THE COURT:  Maybe you should have worded it an

18  emergency motion to transport him.  Because when you use the

19  word "release" prior to an initial appearance when we're going

20  to be discussing detention, it suggests something.

21          MR. CLARK:  I apologize, Your Honor.  If we did it

22  inartfully, it was not meant that way.  It's our aim and desire

23  to get Mr. Nader medically evaluated by a competent authority.

24          We believe that the nearest competent authority are

25  the doctors at the Inova Fairfax Center.  We've presented to

```
1    the Court both that application and a series of conditions that

2    Stroz Friedberg would put into place to get him there that, you

3    know, have been used in the Madoff case with an individual who

4    is facing --

5              THE COURT:  Well, that's not what you asked for in

6    your supplemental memorandum.  You asked for release

7    conditions, and one of those conditions is he live in a

8    long-term care facility.  That's --

9              MR. CLARK:  If necessary.

10             THE COURT:  -- dramatically different than him being

11   transported to an Inova facility for an evaluation.

12             MR. CLARK:  If necessary, Your Honor.  So, I mean,

13   there -- presumably, an evaluation is going to come back with

14   what needs to be done about Mr. Nader's medical condition.

15   That's, that's our goal.

16             And it may be that he needs significant cardiac

17   aftercare, or it may be that he doesn't.  If he needs

18   significant cardiac aftercare, which wouldn't be surprising

19   after triple bypass open heart surgery --

20             THE COURT:  Well, this is a detention hearing.

21             MR. CLARK:  Okay, Your Honor.

22             THE COURT:  We're here to determine whether there are

23   a combination of conditions that would reasonably assure your

24   client's appearance at future court proceedings and the safety

25   of the community.
```

1          MR. CLARK:  Yes, Your Honor.

2          THE COURT:  Not whether he needs to be medically

3     evaluated.

4          MR. CLARK:  Okay.  Well, I'll address that then, Your

5     Honor.  Mr. Nader, as the government has detailed, has been

6     called upon to appear in court dozens of times in the United

7     States, and he's always appeared.  Your Honor is right, the

8     situation here is different from there because there's a

9     mandatory minimum sentence that he's facing, and we've proposed

10    to ensure his continued appearance the most restrictive set of

11    conditions conceivable and ones that have been employed in

12    cases with far higher potential sentences and that, indeed,

13    were, were levied on defendants and guaranteed their

14    appearance.

15         So Stroz Friedberg would post two round-the-clock

16    armed guards wherever Mr. Nader was staying.  He would be, as

17    the statute requires, subject to --

18         THE COURT:  And they would be paid by whom?

19         MR. PRABHU:  Mr. Nader.

20         THE COURT:  And if Mr. Nader stopped paying them,

21    they would go away.

22         MR. CLARK:  He would be remanded.

23         THE COURT:  No, they would just leave.

24         MR. CLARK:  They would not, Your Honor.

25         THE COURT:  And he would then be capable of simply

1   walking out of the facility.

2             MR. CLARK:  To be clear, Your Honor, we would engage

3   Stroz Friedberg, Latham & Watkins, we would pay Stroz

4   Friedberg.  Mr. Nader eventually pays our bill.

5             THE COURT:  And since you will be paying them, they

6   will be obligated to do what you tell them to do.

7             MR. CLARK:  That's not correct, Your Honor.  In the

8   other cases and as I'm proffering to the Court right now, Stroz

9   Friedberg, who are all former federal law enforcement officers,

10  have a flight protocol that they adopt --

11            THE COURT:  That will be pursuant to a contract that

12  would be executed between you and them.

13            MR. CLARK:  And we would be happy for the Court to so

14  order it if it makes the Court -- so that we would be subject

15  and Stroz Friedberg would be subject to contempt or any other

16  penalties that would come, come about --

17            THE COURT:  You know how the Court could order it?

18  Make them sign the paperwork as a third-party custodian.  Then

19  they would be obligated to.

20            MR. CLARK:  Your Honor, we don't object to that, and

21  we're happy to check with them about it, if that would give

22  Your Honor more confidence.  This has been done --

23            THE COURT:  It may give me more confidence in regards

24  to whether or not there are a combination of conditions of

25  release to reasonably assure his appearance, therefore,

1    possibly concluding that you may have rebutted the presumption

2    that there are not, and giving the benefit of the doubt to the

3    defendant, which I am required to do when in doubt, the doubt

4    lies in the defendant.  That's one prong.

5              MR. CLARK:  Yes, Your Honor.

6              THE COURT:  Whether or not there are a combination of

7    conditions of release that would reasonably assure his

8    appearance at future court proceedings.

9              You mentioned in your argument concerning that prong

10   that every time he was placed on release, he didn't violate the

11   law.  Well, we don't -- we're not clear about that because no

12   one has a crystal ball.  We don't specifically know yet when

13   alleged child pornography was downloaded and transported and

14   distributed; but that aside, the Court in making its

15   determination of release of detention has to consider more than

16   just future appearance; it has to consider safety of the

17   community; and even though taking you at your word that he may

18   not have committed offenses while on pretrial release, having

19   been convicted before of the substantially identical offense

20   did not prevent him from allegedly committing it again.

21             So what information can you provide this Court that

22   would give it comfort to believe that you have overcome the

23   presumption that no combination of conditions of release will

24   reasonably assure the safety of the community, especially now

25   since the Court has heard not accusations, let's say we will

1   put those aside, he has a conviction for hands-on contact with

2   children, a conviction for child pornography, and he's facing a

3   mandatory minimum 15 years for possession of child pornography

4   now.

5           This seems like an individual who over the years, 40

6   years ago had a propensity, 40 years later still has it.

7           MR. CLARK:  Your Honor --

8           THE COURT:  That's a problem.

9           MR. CLARK:  Understood.  The -- first of all, Your

10  Honor, I take issue with the characterization of the conviction

11  in Prague and the characterization of the proffer of the

12  evidence in Prague.

13          THE COURT:  What's the conviction for?

14          MR. CLARK:  For contributing to the moral corruption

15  of society.

16          THE COURT:  By doing what?

17          MR. CLARK:  The, the conduct alleged was that --

18          THE COURT:  No, the convict -- the conduct for which

19  he was convicted.

20          MR. CLARK:  He pled guilty, Your Honor.

21          THE COURT:  Even better.

22          MR. CLARK:  Thank you, Your Honor.  The conduct for

23  which he pled guilty was having a relationship with two young

24  men who were two years under the age of consent in

25  Czechoslovakia.

31

1           THE COURT:  Sexual conduct.

2           MR. CLARK:  Correct, Your Honor.

3           THE COURT:  Sexual conduct with minors.

4           MR. CLARK:  They were minors, Your Honor.

5           THE COURT:  How was the characterization of me saying

6    hands-on contact with minors not accurate?

7           MR. CLARK:  My apologies to the Court, Your Honor.  I

8    meant the, the multiple characterizations of the government, I

9    thought that's what you were referring to, Your Honor.  I was

10   not trying to contradict Your Honor.  I apologize.

11          So it's, it's, it's obviously a fair question, Your

12   Honor, and there are two ways in which the proposed bail

13   package seems to eliminate the danger to the community that

14   Your Honor has proposed.

15          THE COURT:  In the first conviction, was he placed on

16   supervision?

17          MR. CLARK:  He was, Your Honor.

18          THE COURT:  Was it a condition of his supervision not

19   to commit another federal, state, or local crime?

20          MR. CLARK:  It was, Your Honor.

21          THE COURT:  And he was -- pled guilty in the District

22   of Columbia -- in the Eastern District of Virginia.

23          MR. CLARK:  That's correct, Your Honor.

24          THE COURT:  Was he placed on supervision?

25          MR. CLARK:  He was, Your Honor.

1          THE COURT:  Was a condition of his supervision not to

2    commit another federal, state, or local crime?

3          MR. CLARK:  It was, Your Honor.

4          THE COURT:  And he's here for what, the allegation of

5    committing another federal crime.

6          MR. CLARK:  That's right, Your Honor.  The

7    supervision terminated, obviously.

8          THE COURT:  So the evidence would tend to show that

9    your client has difficulty following court orders when it comes

10   to not committing federal, state, or local crimes, which is the

11   gravamen to the safety of the community prong of Title 18,

12   United States Code, Section 3142.

13         MR. CLARK:  Understood, Your Honor.  Now, to be

14   clear, the conviction was in 19- --

15         THE COURT:  And to be clear, it's a presumption case.

16         MR. CLARK:  Understood, Your Honor.  So in 19- --

17         THE COURT:  So your, your argument is you're

18   overcoming the presumption with two previous convictions

19   involving minors.

20         MR. CLARK:  One conviction in the United States and

21   one conviction --

22         THE COURT:  Two convictions involving minors.

23         MR. CLARK:  Yes, Your Honor.  And the manner in which

24   we propose to overcome that presumption is to have Mr. Nader

25   not permitted to visit with anyone but his attorneys, not to

1  have access to any means of electronic communication, not to

2  have access to a telephone, and so --

3          THE COURT:  Besides not visiting with anyone besides

4  his attorneys, unless the conditions of release that apply to

5  these types of offenses have significantly changed, it probably

6  was a condition of his release when he was previously convicted

7  of possession of child pornography not to have utilization of

8  electronic means -- well, it may not have been because it's --

9          MR. CLARK:  Yeah, it was a long time --

10         THE COURT:  We may have not had the internet.

11         MR. CLARK:  So I didn't want to get in a tit for tat

12  with the Court about it, but there was a conviction in 1990,

13  and his supervised release, I think, was five years, and so he

14  didn't -- he never violated his supervised release.  He, he, he

15  completed his term of supervised release without a violation,

16  and at the time, that wasn't a standard condition of supervised

17  release, and so while Your Honor raises a fair point about the

18  concern that you appropriately have with regard to these

19  issues, it isn't evidence that Mr. Nader ever violated a court

20  order or something that he was required to do by a court.

21  It --

22         THE COURT:  Just the law.

23         MR. CLARK:  Allegedly now, Your Honor, the law.

24  Allegedly.

25         So --

34

1          THE COURT:  Well, previously as well, not allegedly.

2          MR. CLARK:  Admittedly.  Admittedly in that 1990

3  incident, Your Honor.

4          THE COURT:  And the previous case.

5          MR. CLARK:  The previous case was a 1984 case that

6  was dismissed.

7          THE COURT:  No, the previous conviction.

8          MR. CLARK:  That would be the 1990 case in the

9  Eastern District of Virginia or --

10         THE COURT:  No, the case --

11         MR. CLARK:  That's after that, Your Honor.

12         THE COURT:  Well, does it make a difference?

13         MR. CLARK:  Your Honor, it does in the sense that --

14         THE COURT:  So what you're telling me is he was

15 convicted of child pornography, which is possession of

16 pictures, and post-conviction and supervision and any period of

17 incarceration, the decision was to move further down the line

18 of inappropriate activity by now laying our hands on minors.

19         MR. CLARK:  That's certainly not what I'm telling

20 Your Honor.

21         THE COURT:  Well, that's -- if you want to do a

22 timeline, since you've corrected the Court, that's the

23 timeline.

24         MR. CLARK:  Your Honor, my point is simply --

25         THE COURT:  Is that the timeline?

1        MR. CLARK:  That is the timeline, Your Honor.

2        My point is simply Mr. Nader's conditions of release

3   can be arranged such that there is no possibility of him

4   violating any order this Court would issue.

5        THE COURT:  No condition can guarantee that.  That is

6   why the statute doesn't require a guarantee.  It only requires

7   the Court to be reasonably assured.

8        MR. CLARK:  Fair enough, Your Honor.  Thus far --

9        THE COURT:  Don't take off more than you need to.

10       MR. CLARK:  Thank you, Your Honor.  I appreciate it

11  on a day like today.

12       The, the structure that has been employed by Stroz

13  Friedberg to have, call it high-risk inmates released and able

14  to get the treatment that they need has never resulted in

15  anyone not appearing to court, and it has never resulted in

16  anyone violating bail conditions, because the supervision and

17  the strictness are so extreme that he's only going to see the

18  guard, a doctor, and us.

19       He's not going to be able to communicate with the

20  outside world, he's not going to be able to access the

21  internet, he's not going to be able to get texts, and he's not

22  going to be able to telephone people.

23       And so Your Honor's concerns are well stated, and,

24  you know, you've made them clear, but those conditions can

25  ameliorate those concerns such that the Court can have a high

1   degree of confidence that Mr. Nader will not and cannot become

2   a danger to the community, and that's the point of a bail

3   hearing is are there conditions that we can put together, and

4   we've spent a tremendous amount of time and effort with people

5   who are very experienced in these areas in order to be able to

6   come to the Court and say this has been done before, it's been

7   done and ensured the appearance of a defendant in court, it's

8   been done and ensured the defendant didn't violate any of the

9   court's orders, and we have -- we have a defendant here -- and

10  if, you know, Your Honor, we'll keep proffering more medical

11  information until everyone is satisfied -- who has a very

12  serious medical condition that we don't want and I, and I know

13  the Court doesn't want to get worse in incarceration.

14          And so there are challenges here.  There's no

15  question there are challenges here, but we as counsel and

16  Mr. Nader have taken them very seriously.  We've tried to

17  address any loophole that there could be in these conditions,

18  and we, you know, we did -- to Your Honor's point, we did ask

19  the government whether they wanted to discuss with us our

20  proposal, any of the conditions of our proposal, any of the

21  aspects of our proposal, and they didn't.

22          So we don't have their input, but we have done this

23  before, Stroz Friedberg has done this before, and we can submit

24  to the Court that it's never not worked.

25          THE COURT:  With an individual in the same

1   circumstances as your current client?

2          MR. CLARK:  With an individual --

3          THE COURT:  Charged with the same offense, with the

4   same criminal background?

5          MR. CLARK:  There, there are certainly cases with

6   individuals with the same offense, with the same backgrounds,

7   with less restrictive conditions where there's been no

8   violation.

9          THE COURT:  You're saying that this firm, you're

10  representing to the Court, has overseen an individual in

11  federal court facing federal charges with a 15-year mandatory

12  minimum accused of possession of child pornography, who has

13  been previously convicted of possession of child pornography,

14  and then subsequently convicted of an offense for which he has

15  had sexual contact with a minor?  They have successfully

16  overseen that individual under those circumstances?

17         MR. CLARK:  Not, not exactly those circumstances,

18  Your Honor.

19         THE COURT:  I didn't think so.

20         MR. CLARK:  But circumstances which --

21         THE COURT:  Because I don't, in my years of

22  experience have yet to see one of those set of circumstances.

23         MR. CLARK:  Well, Your Honor, I haven't -- I've heard

24  the government say a lot of things about Mr. Nader and his risk

25  factors.  I haven't heard the government say in any respect why

1    this package wouldn't work.

2         There's no -- there's been no argument or submission

3    that Mr. Nader would be able to not come to court, would be

4    able to somehow escape, would be able to somehow flee, and --

5         THE COURT:  You keep focusing on -- I'll give it to

6    you, the Court thinks there might be a combination of

7    conditions of release that could reasonably assure his

8    appearance at future court proceedings.  This last 15 minutes

9    of this conversation has focused on something else.

10        MR. CLARK:  Understood, Your Honor.

11        THE COURT:  What have you provided that overcomes the

12   presumption that there are no combination of conditions of

13   release that would reasonably assure the safety of the

14   community except for your client being under the restrictions

15   of a private security firm?

16        MR. CLARK:  Who we've, we've offered to have --

17        THE COURT:  The question was besides that, what else

18   have you provided this Court that would show that you have

19   overcome the presumption that no combination of conditions of

20   release would reasonably assure the safety of the community

21   under these circumstances?

22        MR. CLARK:  We've also offered the Court a bond in

23   the amount of a million dollars --

24        THE COURT:  Money surely doesn't protect the

25   community.

1       MR. CLARK:  -- to be, to be cosigned by three

2  responsible individuals.

3       THE COURT:  Bonds generally are for purposes of

4  assuring appearance.

5       MR. CLARK:  Well, but the moral suasion of

6  individuals, Your Honor --

7       THE COURT:  Those individuals cannot make another

8  individual not commit a crime.

9       MR. CLARK:  Your Honor --

10      THE COURT:  Your security firm can't do that.

11  Experience shows people who are incarcerated in prison commit

12  crimes, incarcerated with the most secure facilities around.

13  Your client by your suggestion would be in a long-term medical

14  facility, with a guard outside and a guard inside.

15      That's not prison, and people commit crimes in

16  prison.  People commit crimes in the Alexandria Detention

17  Center.

18      Once again, you're not required to guarantee, but you

19  have to give this Court a lot more than you've given it now

20  based on the presumption and your client's criminal history

21  than a private security firm.

22      MR. CLARK:  Well, Your Honor, the, the offenses that

23  have been alleged in the United States have to do with --

24      THE COURT:  What else do you have?

25      MR. CLARK:  Your Honor, at this, at this point,

1   that's our, that's our bail proposal.

2           THE COURT:  Thank you.

3           MR. CLARK:  Thank you, Your Honor.

4           THE COURT:  Anything further?

5           MR. PRABHU:  Does the Court wish to hear anything

6   further from the government?  I can address some of the points

7   that he raised if you like.

8           THE COURT:  Well, it's your request for detention.

9   I'm not going to hold you back from doing whatever you believe

10  is appropriate to fulfill your obligations.

11          MR. PRABHU:  Thank you, Your Honor.  Just, just very

12  briefly, the witness that Mr. Clark talked about made

13  representations about the transportation to the United

14  States --

15          THE COURT:  I'm not even --

16          MR. PRABHU:  Okay.

17          THE COURT:  You can set that aside.

18          MR. PRABHU:  Well, we also want to put on the record

19  that Mr. Nader was seen by a physician on Monday, when he

20  arrived.  It was a requirement of --

21          THE COURT:  It's protocol.

22          MR. PRABHU:  It's a requirement of the marshals that

23  the FBI take him to a hospital to get him certified.  They did

24  that.  He was certified.  In fact, the doctor said:  Don't

25  bring healthy people in here.

1          So the idea that he has seen no medical professionals

2    is wrong.  We, we definitely have tried everything we can to

3    ensure Mr. Nader's health and are supportive of any measures at

4    ADC to make sure that that happens.

5          We don't think that because Mr. Nader has access to

6    massive resources, he should get a different situation than the

7    typical defendant.  The cases that they're referring --

8          THE COURT:  And that would not be the current state

9    of the law.

10          MR. PRABHU:  Right.  Thank you, Your Honor.

11          THE COURT:  This matter is before the Court because

12   the government has requested detention of the defendant,

13   Mr. George Aref Nader, pretrial on the charge of transportation

14   of visual depictions of minors.  As noted by government

15   counsel, this is a presumption case based on the allegation

16   itself.  That means this Court is to presume that there are no

17   combination of conditions of release that would reasonably

18   assure the defendant's appearance at future court proceedings

19   and the safety of the community, which places the obligation to

20   rebut that presumption on the defense.  The defense is required

21   then to produce information, if it so has such information, to

22   rebut the presumption.

23          The Court, as noted, believes they may have presented

24   sufficient enough information to rebut the presumption

25   concerning the risk of nonappearance.  The Court's obligation

1    does not stop there.

2         The Court does not believe that defense has produced

3    sufficient enough information to rebut the presumption that

4    there are no combination of conditions of release that would

5    reasonably assure the safety of the community.  As noted in

6    both proffers and arguments of counsel and statements by this

7    Court, Mr. Nader stands before the Court not for a charge for

8    which he had been convicted previously in the Eastern District

9    of Virginia but an enhanced charge.

10        It's the Court's understanding he was previously

11   convicted of possession of -- of possession of child

12   pornography.  Transportation, well, he hasn't -- he's not

13   gotten any better, it appears.  Thirty years ago,

14   transported -- pled guilty to transportation of child

15   pornography.  Thirty-plus years later, he's alleged to have

16   transported child pornography.

17        And I did not see the allegations of child

18   pornography that he was convicted of 30-odd years ago, but I

19   would venture a guess that the allegations are a little more

20   onerous this time around, having reviewed the information

21   contained in the affidavit in support of the criminal

22   complaint.

23        And this allegation is subsequent to a conviction

24   for -- after a conviction for transportation of child

25   pornography.  That did not deter Mr. Nader.  He then was

43

1   convicted of an offense which involved sexual contact with

2   minors.  Whatever conviction and punishment he received for

3   that did not deter him because it's alleged he's back to once

4   again transporting child pornography.

5          With the presumption in place and that criminal

6   history, this Court finds there are no combination of

7   conditions of release that would reasonably assure the safety

8   of the community.  Mr. Nader will be detained prior to further

9   proceedings.

10          The Court understands counsel's concerns about your

11  client's medical health.  The Court may not wholeheartedly

12  agree based on some of the submissions provided even by

13  Mr. Nader's counsel concerning his condition, but that's

14  neither here nor there.  Mr. Nader is alleged to have committed

15  an offense for which there's a maximum imprisonment term.

16          There's no maximum -- no offense he's committed now

17  that if convicted, he is to suffer a penalty of death.  Any

18  concerns about his health while being incarcerated, it's the

19  requirement and obligation of his counsel to bring those

20  concerns to the Court's attention via motion, and we will deal

21  with it in that due time.

22          He's remanded to the custody of the United States

23  Marshals pending further proceedings.

24          MR. PRABHU:  Thank you, Your Honor.

25          MR. CLARK:  Thank you, Your Honor.

44

1                    (Which were all the proceedings

2                      had at this time.)

3

4              CERTIFICATE OF THE TRANSCRIBER

5       I certify that the foregoing is a correct transcript from

6  the official electronic sound recording of the proceedings in

7  the above-entitled matter.

8

9                              _____/s/_____

10                                  Anneliese J. Thomson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25