1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION

 3   -----------------------------x
                                  :
 4   UNITED STATES OF AMERICA,    : Criminal Action No.
                                  :
 5             versus             : 1:18-MJ-196
                                  :
 6   GEORGE AREF NADER,           :
                                  :
 7                  Defendant. : June 10, 2019
     -----------------------------x
 8

 9           The above-entitled Preliminary hearing was heard by
     the Honorable Theresa C. Buchanan, United States Magistrate
     Judge.
10
                         A P P E A R A N C E S
11
     FOR THE GOVERNMENT:        JAY PRABHU, AUSA
12                              LAURA FONG, AUSA
                                US Attorney's Office
13                              2100 Jamieson Avenue
                                Alexandria, VA 22314
14
     FOR THE DEFENDANT:         JONATHAN S. JEFFRESS, ESQ.
15                              KaiserDillon PLLC
                                1401 K Street NW
16                              Suite 600
                                Washington, DC 20005
17
                                TIMOTHY MCCARTEN, ESQ.
18                              Latham & Watkins LLP
                                885 Third Avenue
19                              New York, NY 10022-4834

20

21   OFFICIAL COURT REPORTER:   MS. TONIA M. HARRIS, RPR
                                United States District Court
22                              Eastern District of Virginia
                                401 Courthouse Square, Ninth Floor
23                              Alexandria, VA 22314

24

25
```

—U.S. v. Nader—

2

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Government:

Alix Skelton

        Direct examination by Ms. Fong................ 04
        Cross-examination by Mr. Jeffress............. 10
        Redirect examination by Ms. Fong.............. 30

EXHIBITS

On behalf of the Government:

                                                  Admitted

Number 1.......................................... 07

MISCELLANY

Preliminary matters............................... 03
Argument by Ms. Fong.............................. 32
Argument by Mr. Jeffress.......................... 34
Court's ruling.................................... 37
Certificate of Court Reporter..................... 39

EASTERN DISTRICT OF VIRGINIA

3

**P R O C E E D I N G S**

1

2  (Court proceedings commenced at 3:05 p.m.)

3          THE DEPUTY CLERK:  United States versus George

4  Nader.  Case 18-MJ-196.

5          MR. PRABHU:  Good afternoon, Your Honor.  Jay Prabhu

6  and Laura Fong for the Government.

7          THE COURT:  Mr. Prabhu.

8          MR. JEFFRESS:  Good afternoon, Your Honor.  Jon

9  Jeffress and Tim McCarten on behalf of --

10          THE COURT:  Good afternoon.

11          MR. JEFFRESS:  Thank you, Your Honor.

12          THE COURT:  This is on for a preliminary and a

13  detention hearing.  Did you wish to go forward with both of

14  those today, Counsel?

15          MR. JEFFRESS:  Your Honor, I believe the detention

16  hearing was already had.  Okay.  So --

17          THE COURT:  Was that a full detention hearing?

18          MR. PRABHU:  Yes, Your Honor.  It lasted about a

19  hour.

20          THE COURT:  Okay.  So did you want to proceed with

21  the preliminary hearing today?

22          MR. JEFFRESS:  Yes, please, Your Honor.

23          THE COURT:  All right.  Who is the Government's

24  first witness?

25          MS. FONG:  Good afternoon, Your Honor.  United

─────U.S. v. Nader─────

A. Skelton - Direct                                                          4

1   States calls Alix Skelton to the stand.

2            **Thereupon,**

3                        **ALIX SKELTON,**

4   having been called as a witness on behalf of the Government

5   and having been first duly sworn by the Deputy Clerk, was

6   examined and testified as follows:

7            THE DEPUTY CLERK:  You may be seated.

8            THE WITNESS:  Thank you.

9            (Witness seated.)

10                     **DIRECT EXAMINATION**

11  BY MS. FONG:

12  Q.   Please state your name and spell it for the record.

13  A.   Alix, A-l-i-x, Skelton, S-k-e-l-t-o-n.

14  Q.   Where do you work?

15  A.   The FBI.

16  Q.   What's your position with the FBI?

17  A.   Special Agent.

18  Q.   Are you assigned to a particular squad?

19  A.   I am.  The Child Exploitation and Human Trafficking Task

20  Force out of Washington Field Office.

21  Q.   And are you a Special Agent with the FBI?

22  A.   I am.

23  Q.   What are your primary duties as a Special Agent with your

24  particular squad?

25  A.   I investigate all matters of violent crimes against

—————U.S. v. Nader—————

1  children, to include sexual exploitation, kidnappings, sex

2  trafficking of minors, and other Internet-related crimes

3  against children.

4  Q.   Are you one of the agents assigned to this matter?

5  A.   I am.

6  Q.   As one of the agents assigned to this matter, have you

7  reviewed some of the material from the investigation as it

8  pertains to probable cause?

9  A.   Yes.

10  Q.   Are you aware of whether the investigation obtained

11  photographs of George Nader from Government-issued ID's?

12  A.   Yes.

13  Q.   And have you had a chance to review those photographs?

14  A.   I have.

15  Q.   Do you see a person in the courtroom today whose

16  appearance matches that of known photographs of George Nader?

17  A.   I do.

18  Q.   Could you please identify George Nader by what he is

19  wearing and where he is sitting?

20          MR. JEFFRESS:  We stipulate, Your Honor.

21          THE COURT:  All right.  Thank you.

22  BY MS. FONG:

23  Q.   Special Agent Skelton, did you prepare an affidavit in

24  support of a criminal complaint in this case?

25  A.   I did not.

U.S. v. Nader

1   Q.   Have you nonetheless reviewed the complaint affidavit and

2   and its allegations?

3   A.   I have.

4   Q.   Have you reviewed the evidence underlying the complaint

5   affidavit, in particular, the videos described within it?

6   A.   Yes.

7   Q.   And have you spoken to your colleague who was the affiant

8   for the complaint?

9   A.   Yes.

10  Q.   With the help with the court security officer, I would

11  like to provide you with a copy of what has been marked as

12  Government Exhibit 1.

13          MS. FONG:  And I would like the record to reflect

14  that I am giving a copy to defense counsel.

15  BY MS. FONG:

16  Q.   Do you recognize this document, Special Agent Skelton?

17  A.   I do.

18  Q.   What is it?

19  A.   It is the affidavit in support of the criminal complaint.

20  Q.   Is the information contained in Government Exhibit 1 a

21  true and accurate reflection of the facts as known at the time

22  the affidavit was executed?

23  A.   Yes.

24  Q.   Do you have any corrections or additions you would like

25  to make at this time?

─────────────────U.S. v. Nader─────────────────

1   A.   No.

2   Q.   For the purposes of today's hearing, do you incorporate

3   and adopt the facts as set forth in the affidavit as part of

4   your testimony?

5   A.   I do.

6   Q.   All right.

7           MS. FONG:  At this time, the Government moves the

8   document marked as Government Exhibit 1 into evidence.

9           THE COURT:  Any objection, Counsel?

10          MR. JEFFRESS:  No objection.

11          THE COURT:  It is admitted.

12                              (Government's Exhibit No. 1

13                               admitted into evidence.)

14  BY MS. FONG:

15  Q.   I would like to ask you a couple more follow-up

16  questions, Special Agent Skelton.

17          Does the complaint detail material found on an

18  iPhone seized from George Nader?

19  A.   Yes.

20  Q.   Was the iPhone seized from George Nader at Washington

21  Dulles International Airport in January of 2018?

22  A.   Yes.

23  Q.   And is that airport within the Eastern District of

24  Virginia?

25  A.   It is.

U.S. v. Nader

1  Q.    After the phone was seized, did a forensic examiner

2  analyze the phone?

3  A.    Yes.

4  Q.    And did the forensic process retrieve certain chat

5  messages from the phone?

6  A.    Yes.

7  Q.    And did some of the chat messages contain videos?

8  A.    Yes.

9  Q.    And are some of the videos described in paragraph 16 of

10 the complaint in affidavit?

11 A.    They are.

12 Q.    Are you aware of whether time stamp information,

13 associated with the videos, was retrieved during the forensic

14 process?

15 A.    Yes, it was.

16 Q.    And were you able to draw any conclusions from the

17 presence of time stamp information?

18 A.    The fact that these videos contained date and time stamps

19 from when they were either sent or received indicates to me

20 that they were not in deleted status.  So they were active on

21 the phone at the time the phone was seized and analyzed.

22 Q.    Are you aware of whether forensics retrieved any

23 information indicating whether the videos described in the

24 complaint affidavit were sent or received?

25 A.    Yes.

—————U.S. v. Nader—————

1   Q.   And what was that information?

2   A.   Two of the videos were sent and ten of the videos were

3   received.

4   Q.   I would like you to now turn your attention to paragraph

5   16B and C of the affidavit.

6           Do you recall reviewing the videos described in

7   paragraphs 16B and C?

8   A.   Yes.

9   Q.   And can you describe what is occurring in the videos?

10  A.   In video number 2, there is a child, a boy about toddler

11  age, two to three years old, sitting on the floor.  There's a

12  toy bunny in his lap, in his crotch.

13          THE COURT:  We don't need to have her repeat the

14  testimony that's already in the affidavit.

15          MS. FONG:  Noted, Your Honor.

16  BY MS. FONG:

17  Q.   Special Agent Skelton, how many investigations into child

18  exploitation offenses have you been involved in during the

19  course of your time at the FBI?

20  A.   Somewhere between dozens and hundreds.

21  Q.   And are you familiar with the definition of "sexually

22  explicit conduct" as set forth in United States --

23          (Reporter clarification.)

24  BY MS. FONG:

25  Q.   -- Code Section 2256(2)(A)?

U.S. v. Nader

1   A.   Yes.

2   Q.   In your opinion, do the videos, described in the

3   complaint affidavit, contain sexually explicit conduct

4   depicting minors?

5   A.   Yes, they do.

6          MS. FONG:  Your Honor, nothing further as to

7   probable cause from the Government.

8          But, I would like to note that we have a disk

9   containing copies of videos described in the complaint

10  affidavit, if Your Honor should wish to review this material.

11         THE COURT:  No.

12         MS. FONG:  Okay.  Thank you.

13         THE COURT:  Cross-examination.

14                    **CROSS-EXAMINATION**

15  BY MR. JEFFRESS:

16  Q.   Good afternoon, Agent Skelton.

17  A.   Good afternoon.

18  Q.   Agent Skelton --

19         MR. JEFFRESS:  For the record, Your Honor, I have

20  made a Jencks request from the Government, and I've received

21  information that there are no Jencks, but if I could just

22  briefly inquire of the witness.

23         THE COURT:  Okay.

24         MR. JEFFRESS:  Thank you.

25  BY MR. JEFFRESS:

─────U.S. v. Nader─────
A. Skelton - Cross                                                    11

1  Q.   Have you prepared any 302s for this particular

2  investigation?

3  A.   I have not.

4  Q.   Have you testified in the Grand Jury for this

5  investigation?

6  A.   I have not.

7  Q.   Have you done any paperwork whatsoever?

8  A.   I have not.

9  Q.   Any notes?

10 A.   Nope.

11 Q.   Okay.  How long have you been on the -- you said you're

12 on the Child Exploitation Task Force?

13 A.   Yes, sir.

14 Q.   And how long has that been?

15 A.   I've been on this task force here, at the Washington

16 Field Office, for just about three years.  I was on a similar

17 squad in a different field office prior to my assignment here

18 at WFO.

19 Q.   Okay.  What was the other office?

20 A.   Albany Division Syracuse Resident Agency.

21 Q.   Okay.

22 A.   Upstate New York.

23 Q.   I see.

24       And you estimate you participated in between dozens

25 to a hundred federal child pornography investigations?

U.S. v. Nader

A. Skelton - Cross                                                    12

 1  A.   Yes, sir.

 2  Q.   Okay.  So you adopted Government's Exhibit No. 1, which

 3  is the affidavit submitted by Agent Delacourt in this case; is

 4  that correct?

 5  A.   Yes.

 6  Q.   And did you work with Agent Delacourt in preparing this

 7  affidavit?

 8  A.   I did not.

 9  Q.   Okay.  But you are familiar with its contents and you

10  adopted it during your direct testimony?

11  A.   Yes, sir.

12  Q.   All right.  So I think I'll go through the affidavit and

13  ask various questions about the affidavit you've adopted,

14  okay?

15  A.   Yes, sir.

16  Q.   Let's start with paragraph 10.

17       Are you there?

18  A.   Yes.

19  Q.   Okay.  And that paragraph concerns the seizure of three

20  iPhones, actually, that Mr. Nader had in his possession when

21  he came in January of 2018; is that correct?

22  A.   Correct.

23  Q.   All right.  And in fact, what it reflects is the Customs

24  and Border Patrol agents questioned Mr. Nader about his -- the

25  number of electronic devices he had, correct?

U.S. v. Nader

A. Skelton - Cross                                                         13

1   A.   It's my understanding he was interviewed at that time.   I

2   do believe it was CBP, correct.

3   Q.   Okay.  And Mr. Nader, based on your impression, what you

4   understand from Agent Delacourt and from the affidavit, Mr.

5   Nader voluntarily and truthfully informed the Customs and

6   Border Patrol agents about the number of iPhones he had,

7   correct?

8   A.   Correct.

9   Q.   And that include iPhone numbers -- I'm sorry, iPhone 7 or

10  model 7?

11  A.   Correct.

12  Q.   Which is the iPhone sort of underlying the rest of this

13  affidavit?

14  A.   Yes.

15  Q.   Is that correct?

16  A.   Yes.

17  Q.   All right.  So Mr. Nader told them about that up front?

18  A.   As far as I'm aware.

19  Q.   Okay.  And they seized the -- and then at a later date,

20  they executed a search warrant to seize that iPhone along with

21  two others?

22  A.   That's my understanding.

23  Q.   Okay.  And then in paragraphs 13 to 14 of your affidavit,

24  you address the -- or, I'm sorry, Agent Delacourt addresses

25  the search of those iPhones, correct?

—————U.S. v. Nader—————
A. Skelton - Cross                                                14

1   A.   Yes.

2   Q.   All right.  Now and neither you nor Agent Delacourt have

3   ever actually been in possession or analyzed the iPhone 7 that

4   undercut -- that is the basis for this affidavit, correct?

5   A.   I know that I have not.  I can't speak to whether Agent

6   Delacourt has or has not.

7   Q.   Okay.  But you've reviewed this affidavit?

8   A.   Yes, sir.

9   Q.   And you've talked to Agent Delacourt?

10  A.   Yes, sir.

11  Q.   And what it seems to reflect is that, in fact, Agent

12  Delacourt was given a disk or a thumb drive that contained the

13  images?

14  A.   Correct.

15  Q.   And did not have access to the phone himself?

16  A.   My understanding is that he reviewed a forensic

17  extraction completed from the phone.  Whether he also

18  possessed the phone, I can't speak to.

19  Q.   Okay.  It certainly doesn't say that in here?

20  A.   Correct.

21  Q.   All right.  And you've never had possession of the iPhone

22  7?

23  A.   No, sir.

24  Q.   Have you ever looked at the hard drive that is reflected

25  on here as containing the images?

———————U.S. v. Nader———————
A. Skelton - Cross                                          15

1  A.   Not the actual hard drive, no.

2  Q.   Okay.  So how do you conduct your review of the images

3  then?

4  A.   They were provided in an extraction report, which I have

5  seen.

6  Q.   Okay.  Was that a Cellebrite?

7  A.   I believe so.

8           THE COURT:  Was that a what?

9           MR. JEFFRESS:  A Cellebrite extraction.

10          THE COURT:  Okay.

11          THE WITNESS:  Yes.

12 BY MR. JEFFRESS:

13 Q.   In paragraphs 13 and 14, you discuss the forensic

14 processing that the other agent did of the iPhone -- or I'm

15 sorry Agent Delacourt discusses the forensic processing that

16 the other agent did, correct?

17 A.   Correct.

18 Q.   And have you talked to Agent Delacourt about that

19 forensic processing and read the affidavit?

20 A.   Not specifically beyond that it was completed.

21 Q.   All right.  Are you aware of any of the search protocols

22 that were used by the agents who searched Mr. Nader's phone?

23 A.   No, sir.

24 Q.   You don't know whether they used any kind of restrictions

25 on the amount of information they were accessing from the

U.S. v. Nader

1   phone?

2   A.   I don't.

3   Q.   Were you aware of any limits, whatsoever, by either, you

4   know, your team or the Office of Special Counsel's team, that

5   searched Mr. Nader's phone, to limit the extraction of

6   information?

7             MS. FONG:  Objection, Your Honor.  Speaking to facts

8   outside of the record.

9             THE COURT:  Objection overruled.

10            MR. JEFFRESS:  I'm sorry?

11            THE COURT:  Overruled.

12            MR. JEFFRESS:  Thank you.

13            THE WITNESS:  I'm not sure if I understand the

14   question.  Can you --

15   BY MR. JEFFRESS:

16   Q.   Are you aware of any limits to -- are you aware of any

17   efforts to limit the amount of information that was extracted

18   from the phones by either your team or the Office of Special

19   Counsel's team?

20   A.   So limit the extraction, I'm not aware of any.  I do know

21   that a second search warrant was obtained as a result of

22   evidence outside the scope of the original search warrant.

23   Q.   Right, but that search warrant was obtained based on what

24   an agent, who was working on the other investigation, as its

25   referred to in the affidavit, saw on the phone, correct?  Or

U.S. v. Nader

1   in his --

2   A.   Correct.

3   Q.   All right.

4        THE COURT:  Could you speak up a little bit?

5        MR. JEFFRESS:  Sure.  I'm sorry, Your Honor.

6   BY MR. JEFFRESS:

7   Q.   So by the time that that search warrant was obtained, an

8   agent of the FBI had already looked at the images present on

9   Mr. Nader's phone, correct?

10  A.   Can you repeat that?  I'm sorry.

11  Q.   By the time the -- the warrant you just referred to.

12  A.   The first one or the second one?

13  Q.   The second one.

14  A.   The second one.  Okay.

15  Q.   Yes, the one obtained by your team.

16  A.   Okay.

17  Q.   That was obtained based on images that had been, you

18  know, uncovered or seen by the agent working for the Special

19  Counsel's team, correct?

20  A.   Correct.

21  Q.   All right.  And that was the basis for obtaining the

22  warrant, correct?

23  A.   Correct.

24  Q.   Now, does that agent, the agent who works on the Special

25  Counsel's team, as far as you know, does he work on the Child

U.S. v. Nader

1    Exploitation Task Force?

2    A.    Not as far as I'm aware.

3    Q.    Has he ever?

4    A.    Not as far as I'm aware.

5    Q.    Does he have any experience prosecuting child pornography

6    offenses?

7    A.    That I have -- could not speak to.

8    Q.    So you don't know if he's had training on what

9    constitutes child pornography?

10   A.    I do not.

11   Q.    Okay.  So after that agent uncovered those images, you

12   and Agent Delacourt got involved; is that correct?

13   A.    No, sir.  Just Agent Delacourt.

14   Q.    Okay.  When did you get involved?

15   A.    Thursday of last week.

16   Q.    Okay.  So given that you have not personally seen the

17   phone, are you able to explain how the images are on the

18   phone?

19   A.    It's my understanding that they are contained within

20   WhatsApp chat images that are stored on the phone.

21   Q.    So, in other words, they're attachments to WhatsApp

22   messages; is that correct?

23   A.    Correct.

24   Q.    And is that the only way that images were present on Mr.

25   Nader's phone?

EASTERN DISTRICT OF VIRGINIA

U.S. v. Nader

1  A.   I can't speak to anything else.  My understanding and my

2  knowledge is that the 12 files discussed in this affidavit are

3  all contained in the WhatsApp messages.

4  Q.   Okay.  So you're not aware of any other source of child

5  pornography on Mr. Nader's phone except for what he's been

6  sent by someone else on WhatsApp?

7  A.   Two of the files were sent out via WhatsApp.

8  Q.   Okay.  But in terms of how he received them?  You mean he

9  must have received them at some point in order to send them

10  out --

11        THE COURT:  When you say that they were sent out,

12  you mean that -- that these images or the videos were sent out

13  from the defendant's phone to someone else?

14        THE WITNESS:  Correct.

15        THE COURT:  Okay.  I'm sorry.  I didn't mean to

16  interfere with your question.

17        MR. JEFFRESS:  Oh, I'm sorry.  Thank you, Your

18  Honor.

19  BY MR. JEFFRESS:

20  Q.   Whoever was using the WhatsApp on Mr. Nader's phone, how

21  that person received the images was through WhatsApp, correct,

22  as far as you know?

23  A.   I couldn't say one way or the other.  The outgoing videos

24  are not reflected in the incoming messages, so I don't know

25  where they've come from.

U.S. v. Nader

1  Q.   Okay.  So they might have just been deleted at some point

2  from WhatsApp, is that a possibility based on your

3  understanding?

4  A.   I couldn't speak to where they came from.  All I know is

5  they were sent out via WhatsApp.

6  Q.   All right.  So you're not aware, though, of any other

7  source -- you don't know of one, other than WhatsApp, on Mr.

8  Nader's phone?

9  A.   Correct.

10 Q.   Okay.  So in your cases, frequently, working in this

11 section, you have people who download commercial pornography

12 from websites, correct?

13 A.   Correct.

14 Q.   You have people who participate in peer-to-peer networks

15 where they -- where they share child pornography by posting on

16 various bulletin boards, right?

17 A.   Correct.

18 Q.   Lack of better term, correct?

19 A.   Yes.

20 Q.   And there is no evidence of any type -- of any kind like

21 that in Mr. Nader's case, correct?

22 A.   I have not reviewed the full extraction report or the

23 entire contents of the phone or the other phones, so I can't

24 speak to whether or not additional evidence exists.  All I can

25 speak to is the evidence that I have seen, which are the 12

U.S. v. Nader

1  videos.

2  Q.    All right.  So you're not aware of anything else?

3  A.    Correct.

4  Q.    And in this case, the way the WhatsApp messages work,

5  that they contain the child pornography, are they stacked one

6  on top of each other; in other words, for lack of a better

7  word, strings of messages?

8  A.    They're shortened conversations, so the entirety of a

9  conversation between identical participants is stored

10  chronologically.

11  Q.    Okay.  And you said that there were -- withdrawn.

12         Do you know were any of the evidence of the

13  distribution of the images support that they -- that those

14  images were sent out in the United States?

15  A.    I don't know.

16  Q.    Okay.  So you don't have -- you're not aware of any

17  evidence demonstrating that these images were either received

18  or sent out in the United States?

19  A.    Correct.

20  Q.    Correct?

21  A.    Correct.

22  Q.    And -- okay.  I want to get into the images, if that's

23  okay.

24         First, let me just ask you a question.  Do you know

25  what the National Center for Missing and Exploited Children

A. Skelton - Cross                                                    22

1    is?

2    A.    I do.

3    Q.    Okay.  And do you know about the database that they keep

4    of child --

5    A.    I do.

6    Q.    -- of known child pornography images?

7    A.    Yes, sir.

8    Q.    Okay.  Can you explain what that is?

9    A.    It's a database maintained, as you described, which it

10   has two parts, a database of images and videos of child

11   pornography where the victims are known to law enforcement, to

12   the National Center.

13          And then, a second database of images and videos

14   which have been seen before by the National Center, have been

15   submitted by law enforcement, but the subjects of those videos

16   are unknown.

17   Q.    Okay.  And it's actually an extremely thorough and large

18   database, correct?

19   A.    Yes.

20   Q.    And the effort there, at least what they're trying to do,

21   is to capture every known image of child pornography in the

22   world and then assign a unique numeric identifier to it; isn't

23   that correct?

24   A.    I can't speak to whether or not there's identifiers.  We

25   regularly submit our information so that it can be added to

——————U.S. v. Nader——————

1  the database to make it as robust as possible.  But --

2  Q.   That's right.  And that's what you guys are trying to do,

3  right?

4  A.   Correct.

5  Q.   You're trying to make that database as complete and total

6  as possible, in terms of being a reliable source for all the

7  child pornography that's out there, correct?  That's the

8  effort?

9  A.   An attempt, yes.

10 Q.   All right.  And in fact, what you do when you have an

11 image -- or a standard operating procedure for agents, when

12 you have an image that, you know, you don't know whether

13 they've qualified it as child pornography or not, to submit a

14 technical request to the -- to NCMEC?

15 A.   No.  That's not completely accurate, no.

16 Q.   Okay.  Well, what --

17 A.   The National Center does not make any determinations

18 about whether an image or a video is or is not child

19 pornography.  They simply catalog it and notify us if the

20 video image or video has been seen before and/or if the child

21 in that or the person in that video is an identified child.

22 Q.   Okay.  And the first thing you said there was whether

23 that image had been seen before?

24 A.   Correct.

25 Q.   Okay.  And so whether they had had it -- have it in their

U.S. v. Nader

1   database?

2   A.   Correct.

3   Q.   And the whole purpose of the database is to collect all

4   the child pornography images out there, right, or as many they

5   can get their hands on?

6   A.   I don't know that I can answer that question.  That's

7   probably a better question for the agency.

8   Q.   Okay.  Do you know -- did you submit the 12 images that

9   are at issue in this case; did you or Agent Delacourt, or

10  anyone else, as far as you know?

11  A.   I have not.  I suspect they haven't yet been submitted.

12  Usually, that's done near or to the end of the case.

13  Q.   I'm sorry.  Can you repeat that?

14  A.   Usually, they're submitted near or to the end of the case

15  once full forensics are complete, everything is done.  But I

16  can't speak to whether Agent Delacourt has or has not.

17  Q.   I mean this case has been around since what?  You guys

18  have had -- the FBI has had the phone since January of 2018?

19  A.   As I've said, I've been assigned to this case since

20  Thursday, so I can't speak to what else has been done.

21  Q.   Are you aware of any discussion about submitting the

22  images to NCMEC --

23  A.   I have not.

24  Q.   -- for ascertainment; no?

25  A.   No.

U.S. v. Nader

1   Q.   You don't know why that hasn't been done?

2   A.   I'm sorry?

3   Q.   You don't know why that -- do you know whether it's been

4   done or not?  Let me just clarify that.

5   A.   I don't know, one way or another.  I do not know.

6   Q.   Okay.  But you don't -- you're certainly not aware of any

7   effort to do that?

8   A.   Correct.

9   Q.   All right.  I think on direct examination you talked

10  about the definition of sexually explicit conduct and what

11  child pornography was?

12  A.   Yes, sir.

13  Q.   Okay.  And you've reviewed the 12 images in this case?

14  A.   Videos, yes.

15  Q.   Videos.  Okay.  And let's just -- and they are set forth

16  at -- let's start on page 6 of the affidavit in paragraph 16.

17         And I believe you went over that in your direct

18  examination?

19  A.   Yes, sir.

20  Q.   Okay.  Can you tell me, first of all, which two videos

21  were sent out?

22  A.   I don't recall.  I can't recall.

23  Q.   You don't recall which of the 12 videos were sent out?

24  A.   Correct, I don't recall which two.  Since it is a

25  transportation charge and not a distribution charge.

U.S. v. Nader

A. Skelton - Cross

26

1   Q.   But it still has to be child pornography?

2   A.   Correct.

3   Q.   Yes, right?

4   A.   Correct.

5   Q.   Okay.  So have you personally watched each of these

6   images?

7   A.   I have.  Videos, yes.

8   Q.   Each of these videos, I'm sorry.

9        And it's your opinion that all of these are child

10  pornography?

11  A.   Yes, sir.

12  Q.   Okay.  I mean video F - I'm sorry subparagraph F, video

13  number 6 is three seconds in length?

14  A.   Yes, sir.

15  Q.   And that to you qualified as child pornography, you saw

16  enough there?

17  A.   The definition under 2256 includes masturbation, and

18  that's exactly what's occurring in that video.

19  Q.   So all right, let's just go -- again, unfortunately, you

20  don't which ones were sent out and which ones were received?

21  A.   Correct.

22        (Reporter clarification.)

23  BY MR. JEFFRESS:

24  Q.   Okay.  And so let me just ask:  Video 1, I think you

25  referred to that one during your direct examination.  You

U.S. v. Nader

1  know, what evidence are you aware of that Mr. Nader knowingly

2  had that on his phone?

3  A.    As I indicated, these messages were received during a

4  WhatsApp chat message -- chat conversation that then

5  continues.  The images and -- videos, rather, are not deleted.

6  They're present on the phone in their original native state,

7  and he was engaging in that -- or someone using that cell

8  phone was engaging in that conversation.

9  Q.    Well, what's the conversation?

10  A.    It's not in English, so I can't speak to that.

11  Q.    Okay.  So you don't know what it is?

12  A.    Correct.

13  Q.    All right.  So there's no evidence from the chats

14  themselves, that you're aware of, at least in the untranslated

15  form, that support the fact that there was knowing possession

16  of any of these images, correct?

17  A.    They came in, the conversation continues.  The way a

18  WhatsApp conversation occurs, you see the message as it

19  appears.

20  Q.    But if you can't translate the conversation, then the

21  conversation is useless to you as evidence; is that fair?

22  A.    The content.  I can see that there are incoming and

23  outgoing messages, and therefore there is a conversation

24  occurring.  I don't know what the content of that conversation

25  is, but there is a conversation.

U.S. v. Nader

A. Skelton - Cross

28

Q.   Okay.  And is there a way to see whether the video has actually been accessed, and opened, and watched?

A.   I don't know the answer to that from the information that I have in front of me right now.

Q.   No?

A.   I can't speak to that.

Q.   Okay.  So you're not aware of any way, technically or otherwise, and you have not done any investigation, you're not aware of any investigation, that shows that those images were actually accessed and watched by Mr. Nader or anybody else?

A.   I don't -- there's no information that I have currently to answer that question, no.

Q.   Okay.  So I think we talked about video 1.  I don't want to take up too much of the Court's time by going through each video.

So I'll just ask you:  Other than what you've just referred to, which is, you know, a conversation that's in a foreign language, and the fact that, you know, the video is received and two were sent out -- but we can't say which ones -- that's the only evidence you have that these were -- the only ones that you're aware of, that these images were possessed knowingly?

A.   Correct.

Q.   Okay.  And do you have any evidence that -- you don't have any statements from Mr. Nader to law enforcement?

1   A.   Not that I'm aware of.

2   Q.   Okay.  And you're not aware of any statements, other than

3   in a foreign language that you haven't been able to read, of

4   Mr. Nader to anyone else supporting knowing possession of

5   these images?

6   A.   Not that I'm aware of, no.

7          THE COURT:  Has there been a transcription of the

8   audio in any of the videos?

9          THE WITNESS:  My understanding is it's been

10  requested from language services.

11         THE COURT:  And what about the WhatsApp chats?

12         THE WITNESS:  The same.  Also requested from

13  language services.

14         THE COURT:  When was it requested?

15         THE WITNESS:  I don't know the answer to that, Your

16  Honor.

17         MR. JEFFRESS:  Court's indulgence.

18         (A pause in the proceedings.)

19  BY MR. JEFFRESS:

20  Q.   Okay.  There's only one example of actual -- well,

21  intercourse in any of these examples, correct?

22  A.   Yes, sir.

23  Q.   Okay.  Do you know -- just a few more questions -- do you

24  know on the phone how the -- they were never placed into

25  folders, correct, the images?

1  A.    No, my understanding is they are still in their native

2  form inside of the chat conversation.

3  Q.    So they were never downloaded?

4  A.    Not that I'm aware of.

5  Q.    Okay.

6         MR. JEFFRESS:  Court's indulgence.

7         (A pause in the proceedings.)

8         MR. JEFFRESS:  No further questions, Your Honor.

9         THE COURT:  Thank you, Agent.

10         Redirect, Ms. Fong?

11                        **REDIRECT EXAMINATION**

12  BY MS. FONG:

13  Q.    Special Agent Skelton, on direct you testified that 10 of

14  the 12 videos, described in the complaint affidavit, were

15  received on the phone in Mr. Nader's possession, correct?

16  A.    Yes.

17  Q.    And that two of the videos described in the complaint

18  affidavit were sent from Mr. Nader's phone to someone else,

19  correct?

20  A.    Yes.

21  Q.    Have you also reviewed information in the case indicating

22  that Mr. Nader was previously convicted of

23  child pornography-related offenses?

24         THE COURT:  What does this have to do with probable

25  cause?

31

1           MR. JEFFRESS:  Thank you, Your Honor.

2           MS. FONG:  Your Honor, I'm trying to establish the

3    state of mind.

4           THE COURT:  State of mind of who?

5           MS. FONG:  Of the defendant, Your Honor.

6           I'll ask a different question, and we'll come back

7    to it if it's relevant then.

8    BY MS. FONG:

9    Q.   Special Agent Skelton, in your experience and training,

10   when someone receives videos containing sexually explicit

11   depictions of minors and then also sends videos containing

12   sexually explicit images of minors, is that consistent with

13   the state of mind of someone who has knowledge of its

14   contents?

15   A.   Yes.

16          MS. FONG:  Court's indulgence, Your Honor.

17          (A pause in the proceedings.)

18   BY MS. FONG:

19   Q.   Special Agent Skelton, are you aware of whether Mr. Nader

20   was previously convicted of child pornography related offense?

21          MR. JEFFRESS:  Objection.

22          THE COURT:  It's in part of the record.  It doesn't

23   really matter.  Objection is overruled.

24          MS. FONG:  Nothing further from the Government, Your

25   Honor.

32

1          THE COURT:  All right.  Thank you.

2          You may step down, Agent.

3          (Witness excused.)

4          THE COURT:  Does the Government have any other

5    witnesses?

6          MS. FONG:  No, Your Honor.

7          THE COURT:  I assume the defendant has no witnesses.

8          MR. JEFFRESS:  No witnesses, Your Honor.

9          THE COURT:  Do you have argument as to probable

10   cause?

11         MR. JEFFRESS:  Yes, I do, Your Honor.

12         THE COURT:  Ms. Fong, I'd like you to make your

13   argument first.  And I'd like, specifically, to know why the

14   Government -- when was the search warrant executed, when were

15   the images downloaded, or forensically extracted, I should

16   say?

17         MS. FONG:  Your Honor, I believe the extraction was

18   performed in January of 2018 and that it was reviewed in

19   February of 2018.

20         THE COURT:  Well, the search warrant for this case

21   was not issued until --

22         MS. FONG:  March, Your Honor.

23         THE COURT:  So when was that?  You say they went

24   ahead and extracted everything with the first search warrant?

25         MS. FONG:  Once there was a search warrant issued in

33

1   the instant case, my understanding is the case agent

2   immediately obtained the evidence on the hard drive.

3           THE COURT:  All right.  So the Government has had

4   the full extraction since at least March of 2018, if not

5   earlier?

6           MS. FONG:  I believe that's the case.

7           THE COURT:  Why did the Government wait 15 months to

8   bring these charges?

9           MS. FONG:  We didn't, Your Honor.  We brought the

10  case -- we charged Mr. Nader in April of 2018, but he was

11  outside of the country, Your Honor.  There's a date-stamp on

12  the complaint affidavit, which has a date-stamp of April 19,

13  2018.

14          THE COURT:  And he, though, has come back and forth.

15          MS. FONG:  He has not, Your Honor.  My understanding

16  is he came back and forth in relation to the other unrelated

17  matter.

18          THE COURT:  He came back and forth to the United

19  States.

20          MS. FONG:  Not since the charges were filed, Your

21  Honor.

22          THE COURT:  Not at all since April of 2018?

23          MS. FONG:  My understanding is, no, Your Honor.

24          So we have been waiting to see whether he would come

25  back.

34

1        THE COURT:  I see.  All right.  Anything else as to

2   probable cause?

3        MS. FONG:  Your Honor, just briefly.

4        We believe that the complaint affidavit sets forth

5   more than what is necessary to establish probable cause for

6   the charge in this case.  Mr. Nader traveled with a phone

7   containing sexually explicit images, depicting minors from

8   overseas into Washington Dulles International Airport, where

9   his phone was thereafter seized and analyzed.  And that

10  constitutes the transportation charge that's outlined in the

11  complaint.

12       MR. JEFFRESS:  Your Honor, I just -- with all

13  respect to the Government, in this one, it doesn't make it.

14       You know if they had maybe translated those chats,

15  those chats, and if they found knowledge of -- that he did

16  this knowingly, that he sent images out or had those images on

17  his phone knowingly, then possibly.  They also don't have

18  proof that any of this happened in the United States.  The

19  fact --

20       THE COURT:  Well, he transported it into the United

21  States.  That's what he's charged with.

22       MR. JEFFRESS:  Knowingly transporting it; correct,

23  Your Honor.

24       THE COURT:  Right.

25       MR. JEFFRESS:  Yes.  And, you know, the idea that he

1   would voluntarily just identify an iPhone that he knows has

2   got child pornography on it is just -- I don't think

3   that's within the realm of possibility --

4         But furthermore, like they don't have proof that he

5   ever really knowingly did that.  I mean if you look at these

6   images, it's clear not all of them are child pornography.

7         THE COURT:  I'm not sure that I would agree with you

8   on that.

9         MR. JEFFRESS:  I don't think -- I think it's a very

10  strong question about whether they meet the definition.  You

11  know I don't understand why they would not have submitted them

12  to the main authority on child pornography who they -- the

13  Government contracts with and works with on a daily basis on

14  these cases --

15        THE COURT:  I understand what you're saying.  But, I

16  don't think that anybody here would believe that the -- that

17  that agency is the determiner of who, what is, and what is not

18  child pornography.

19        I mean I can't believe that you would argue that

20  they're the authority when the Government is the one bringing

21  the charges.  It has to be up to the Department of Justice and

22  the FBI as to whether or not something constitutes child

23  pornography and not the National Center for the --

24        MR. JEFFRESS:  I think ultimately it's up to the

25  Court or to the --

1          THE COURT:  Well, it is.

2          MR. JEFFRESS:  Yeah.

3          THE COURT:  But they're not the arbiters of that.

4   The National Center is not the arbiter of what is or what is

5   not child pornography.  So surely you're not contending that.

6          MR. JEFFRESS:  I just think this would be a

7   significantly stronger case if they had done that and these

8   were identified --

9          THE COURT:  Well, that might be what you think, but

10  what's your argument here as to probable cause?  I mean he's

11  charged with transporting it into the United States.  And

12  whether or not he voluntarily revealed that he had this

13  particular iPhone with him, among several electronic devices,

14  I'm not sure how that's really cutting it one way or another,

15  as to whether or not he knew it was on there.

16          And what about the fact that it was also two of the

17  images or two of the videos were also not only received but

18  sent.

19          MR. JEFFRESS:  Right.  We don't know what the

20  context was.  We don't -- they haven't even been able to show

21  that was -- you know, they haven't even been able to show that

22  that was even Mr. Nader.  I mean it was on his phone, but --

23  we don't know what was said in those images.  We don't know

24  whether he was sending it back to the person and saying, don't

25  send me this stuff anymore.

1      I mean they have had those messages for quite a long

2  time without engaging the services of a translator who could

3  have very easily told us what they said.  But without that

4  content, I don't think we could say that he knowingly

5  possessed child pornography.  It very well could --

6          THE COURT:  But that's not what he was charged with.

7  He was charged with transporting it.

8          MR. JEFFRESS:  Knowingly, yes.

9          THE COURT:  Right.

10         MR. JEFFRESS:  And so I mean, the fact he has it

11 only in this one app, where it's not even clear, you know, why

12 it's preserved or that he ever even really accessed it with --

13 except with respect to maybe two images, that they can't

14 identify which ones those are.

15         So I think it's just too thin.  It's too thin on

16 this record, Your Honor.

17         THE COURT:  All right.  Thank you.

18         MR. JEFFRESS:  Thank you.

19         THE COURT:  Look, I agree with you.  I think that it

20 would have been helpful if the Government had received the

21 translation of the conversation on WhatsApp, as well as the

22 conversation on the videos.

23         But the fact of the matter is that probable cause is

24 a rather low bar.  The defendant transported these images into

25 the United States.  I, frankly, think that there's no real

38

1    issue here as to whether or not they are child pornography.

2    But I believe that the Government has established probable

3    cause for the charges to be brought against the defendant.

4            All right.  Is there anything else?

5            MS. FONG:  Nothing further from the Government, Your

6    Honor.

7            THE COURT:  Court stands in recess.

8

9            **(Proceedings adjourned at 3:39 p.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>CERTIFICATE OF REPORTER</u>

2

3          I, Tonia Harris, an Official Court Reporter for

4   the Eastern District of Virginia, do hereby certify that I

5   reported by machine shorthand, in my official capacity, the

6   proceedings had and testimony adduced upon the Preliminary

7   hearing in the case of the **UNITED STATES OF AMERICA versus**

8   **GEORGE AREF NADER**, Criminal Action No. 1:18-MJ-196, in said

9   court on the 10th day of June, 2019.

10         I further certify that the foregoing 39 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16   name, this June 10, 2019.

17

18

19

20
                        _____
21                      Tonia M. Harris, RPR
22                      Official Court Reporter

23

24

25

                                                          39